THE STATE OF OHIO, APPELLEE, *v.* MITCHELL, APPELLANT.

(No. 71-395—Decided March 14, 1972.)

*Mr. James J. Hughes*, city attorney, *Mr. Daniel W. Johnson*, city prosecutor, and *Mr. Donald H. Rathbun*, for appellee.

*Mr. Donald L. Feinstein*, for appellant.

TROOP, P. J. Dewey Mitchell, III, was charged with and convicted of a violation of R. C. 2921.05 in the Franklin County Municipal Court. A "decision" was rendered by the trial court (the trier of the facts) which is reflected in the judgment entry of conviction and sentence, filed November 3, 1971. This appeal is taken from such judgment.

The affidavit filed by the police officer against Mitchell avers that the accused, on January 1, 1971, "did unlawfully desecrate the American flag and did cast contempt on flag by having it sewn or embroided [sic] to the seat of his pants with part of it in crotch area."

The statute allegedly violated reads, in pertinent part, as follows:

"* * * No person shall manufacture or have in possession an article of merchandise upon which is placed or attached a contemptuous representation of such flag, standard, color, or ensign, or publicly mutilate, burn, destroy, defile, deface, trample upon, or otherwise cast contempt upon such flag, standard, color or ensign.

"* * *

"As used in this section 'flag,' 'standard,' 'color,' or 'ensign' includes any flag, standard, color, or ensign or a picture or representation thereof, made of or represented on any substance, and purporting to be a flag, standard, color, or ensign of the United States, or this state or a picture or representation thereof, upon which is shown the colors, the stars, and the stripes in any number thereof, or which might appear to represent a flag, standard, color, or ensign of the United States or of this state."

Counsel for the defendant, appellant herein, bottoms this appeal on three assignments of error. Reduced to their lowest terms, they are as follows: The trial court erred (1) in finding that the affidavit did state an offense under R. C. 2921.05, (2) in finding that section constitutional on its face, and (3) in finding the section constitutional as applied to the defendant in this particular case and in the situation in which he was when arrested.

Defendant was stopped by a police officer for a loud muffler. The customary check by the officer revealed an

existing warrant for Mitchell's arrest which caused him to be moved to the nearby cruiser and "patted down," in the course of which the officer saw what he "deemed" to be a flag "on the seat of his britches." This produced the "desecration" charge.

At trial, the officer described the flag as 6″ x 9″ with seven red and six white stripes, and containing in the blue field 36 white "dots" embroidered through the pants.

The defendant took the stand in his own behalf and explained that he had covered a hole in his jeans with an "iron on patch," and then embroidered the patch with his wife's new sewing machine, trying to make the colors represent a flag "as closely as I could." He admitted that he was trying "to actually produce the American flag" to "the best of my ability."

In further explanation he urged that its "pretty stylish to wear patriotic colors," and added that "no contempt was intended." The witness elaborated as follows: "* * * it was close to the flag, but I didn't make it exact."

An "iron on patch" used to repair a hole in one's jeans ordinarily falls short of being an earthshaking event, but, the transformation of the patch into a "representation" of an American flag inflates the repair chore to momentous proportions, especially when the offender elects to use such repair as a vehicle to challenge the flag desecration statute as infringing upon his constitutional right of free speech. The importance of the principles involved is evidenced by the diligence of defense counsel, who examined and suggests that this court review decisions in 54 reported cases, from the Supreme Court of the United States to trial courts of all kinds, as well as pertinent code sections and a law journal article.

The time consumed in digging out such a quantity of authority, and digesting it moves far beyond the practical limits of a reviewing court of appeals. This situation appears to be a new phenomenon in modern judicial society. In this instance, the indigent defendant received legal services, supplied at the trial level and on appeal by the legal aid and defender society, which could only have

been purchased by very wealthy men. The irony of the situation is that middle-class folks who could not afford to hire counsel for such a defense effort pay the taxes to foot the bill. This court cannot, within the limits of time, review every case cited, but must rely upon those that seem to be pertinent and illustrative of facets of the problem presented.

Before discussing the assignments of error proffered by the defendant, it might be helpful to review the pertinent constitutional provisions which should be in the background as the review progresses. The First Amendment to the Constitution of the United States reads as follows:

"Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

It is well to note that the term "freedom of expression," frequently found in the decisions of courts as something afforded protection under the amendment, is not, in fact, found in the language quoted.

The language used in the Ohio Constitution, Section 11, Article I, is different, and considered by this court preferable. It is as follows:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

Again, what the provision protects is limited. It states one may "freely speak, write, and publish his sentiments," but is responsible for abuses. Laws may not restrain or abridge "speech" or "the press." No reference is made to any other form of "expression," such as "symbolic speech."

Counsel for defendant, for his first assignment of error, urges that the trial court erred in finding that the affidavit filed against Mitchell stated an offense under R. C. 2921.05, because:

(A) The words of the statute "otherwise cast contempt" do not by themselves state an offense;

(B) The legislative amendment adding "otherwise" meant something other than a "physical act";

(C) There was no allegation or proof of criminal intent.

A familiar doctrine used in statutory construction, the existence of which counsel for the defendant acknowledges, is *ejusdem generis*. Counsel, however, refuses to accept the doctrine as appropriate to the instant statutory enactment—the subject of his first assignment of error.

The words (in R. C. 2921.05) publicly mutilate, burn, destroy, defile, deface, trample upon or otherwise cast contempt," form a typical *ejusdem generis* pattern. The "and any other" and "or otherwise" inclusions in statutes are many and varied. This court considered at great length the phrase "and any other compound," and the application of the doctrine of *ejusdem generis* as it applied to such phrase, in an unpublished decision in *State* v. *Bailey*, Case Nos. 10002-3, June 22, 1971 (*cert. denied* November 19, 1971). In the decision, reference was made to 50 Ohio Jurisprudence 2d 302, Section 320, Sutherland, Statutory Construction, 3 Ed., Volume 2, and to a variety of decisions of Ohio courts. At page five, the decision quotes at length from both texts. The import of the doctrine is well expressed by language from the Ohio Jurisprudence 2d text, at page 303, as follows:

"* * * such terms as 'other,' 'other thing,' 'others,' or 'any other,' when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles, things, or matters of the same nature as those previously described."

An examination of the statutory language (R. C. 2921.-05) indicates that an "otherwise" act must be physical and of the same basic nature as "defile," "deface," "trample upon," to note the terms closest to the word "otherwise."

To attach a representation of a flag to the crotch seam of a pair of jeans is to "defile," in the common usage of the term, an accepted definition being "to make dirty," and is a far cry from the use made by a patrolman who wears it on the sleeve of his blouse or attached to a shirt covering

his breast. In that location on the defendant's pants, it is effectively "trampled upon" by the posterior of the wearer, as effectively in fact as if it were under his feet.

The legislative intent in inserting the word "otherwise" is clearly shown by the nature of the acts specifically set out in the statute just preceding such word. There is no valid reason to refuse to apply the doctrine of *ejusdem generis* to the statute here violated merely because it deals with flag desecration, when it has been consistently followed in the construction of many other laws which set out specific words and couple therewith a comprehensive clause, or phrase, to cover the other items of a similar nature already in existence or which the ingenuity of man may contrive.

Counsel says that the affidavit is also defective because it does not allege "intent." The statute involved is one of those which makes an indifferent act a wrong. The descriptive term is *malum prohibitum*. The law is not *malum in se*, to put it conversely. In the instance of a law *malum prohibitum*, it is not necessary to allege that the offense was knowingly committed. The New York Court in *People* v. *Radich* (1967), 53 Misc. 2d 717, 279 N. Y. S. 2d 680, speaks directly on the matter, holding specifically that the offense of desecrating the American flag is *malum prohibitum*, and no criminal intent is prerequisite to conviction. That court correctly stated the applicable law. In contrast to the federal statute which now says "knowingly," the Ohio statute has no such requirement but simply outlaws an act "contemptuously" done.

It is noted also that defendant urges that the offending patch was not a flag. The statute covers also a "representation," and by the defendant's own testimony his handiwork was not exactly a flag but it came close to being one.

For the reasons advanced, defendant's first assignment of error is not well taken and is overruled.

Because defendant's second and third assignments of error involve the general question of constitutionality, on its face and as to this defendant, the two will be discussed as one.

The multitudinous decisions concerned with violations, the perpetrators of which seek the protection of the First Amendment, indicate the extent to which more modern courts have gone in expanding the simple purpose the framers of the constitutional amendments had in mind. The desire to be able to speak, write, and print political views without restraint even if sharply critical of governmental incumbents, born of recent experience, was a dominant urge of our forefathers. The enlargement of that concept in recent years to include "expression" and "symbolic speech" confounds the wisest, as is evidenced by the differences of opinion reflected in decision law and the effort referred to as "balancing" injected into some opinions. On the one hand, the concept of "pure speech" might be said to appear "pure speech" and on the other hand, with a wide spread in between, is the "symbolic speech" concept.

Decisions deal with statutes and, rather uniformly, the question of constitutionality confronts the courts. Congress enacted a federal desecration act, and each of the states has a comparable statute. The Ohio act is basically similar to the federal act except that the latter is without the "otherwise" provision which this review has previously considered.

A decision in *Street* v. *New York* (1969), 394 U. S. 576, recognized the confusing interplay of speech and act in certain patterns where protection under the First Amendment was sought, and then proceeded to avoid the providing of a legally acceptable answer to the confusion. Street burned a flag on a street corner near his home, as a protest against the handling of James Meredith, and at the same time spoke contemptuously about the flag. The reviewing court said, at page 589, that it was "unable to say with certainty that appellant's words were not an independent cause of his conviction." It held, at 594, that it could not "sustain a conviction that may have rested on a form of expression, however distasteful, which the Constitution tolerates and protects." The court observed that while the First Amendment affords protection, it is less for some conduct than it is for "pure speech." Even Chief Justice Warren and Justice Fortas agreed that the United States and the states

could protect the flag and acts were not entitled to the same protection as speech alone.

A California case of about the same vintage as *Street* should be noted. The court in *People* v. *Cowgill* (1969), 78 Cal. Rptr. 853, dealt with a defendant who caused a flag to be cut, sewn into a vest and worn on the public streets. A violation of the California desecration statute was charged. The court said that the statute did not apply to words but to acts. Paragraph 5 of the syllabus states: "states have a right to protect [the] flag of [the] United States from acts of desecration and disgrace." Even though so holding, the court opened the door just a crack to broaden its inclusion when it said, at page 855: "We recognize that acts other than pure speech may be methods of expression of ideas which warrant the protection of the first amendment." Further, at 855, the court said that it was following Chief Justice Warren in *United States* v. *O'Brien* (1968), 391 U. S. 367, 88 Sup. Ct. 1673, and it quoted from the decision, as follows:

"[We] 'cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. * * *' "

The California court adds, at the same page:

"Even if we concede that defendant's acts were 'symbolic speech' it does not follow that the same kind of freedom is afforded him by the first amendment as is afforded to those who communicate ideas by pure speech."

And, as if glancing through the crack when the door was slightly ajar, the court added:

"* * * a sufficiently important governmental interest in controlling the nonspeech element can justify incidental limitations on First Amendment Freedoms."

When confronted with the "symbolic speech" issue, flag desecration can be labeled "conduct," and, pure speech being relatively inconsequential, any First Amendment protection may safely be ignored.

The troublesome combination of speech and act had raised their ugly heads earlier in a draft card burning incident in New York in front of an army building, and were

dealt with in *United States* v. *Miller* (C. C. A. 2, 1966), 367 F. 2d 72. The burner made a speech in the course of the burning. The court said, at page 73: "This case raises perplexing issues of whether symbolic conduct is speech embraced by the First Amendment and the extent of its protection thereunder." The defendant was convicted under a federal statute making it unlawful to mutilate or destroy a draft card. Paragraph 9 of the syllabus states that the public interest protected by the proper functioning of the Selective Service System outweighs any alleged abridgement of freedom of symbolic expression of speech by a registrant's burning of his draft card. The court said that the law was a narrowly drawn statute which regulates conduct; that such resulted in only an indirect, conditional, or partial abridgment of free speech; and that the court had to decide whether free speech or public order demands greater protection.

Flag burning statutes are commonly supported by the courts, even when the act of burning is urged to be "symbolic" and protected by the First Amendment—in that the burner is expressing a "political" protest. Such was the defense offered in *United States* v. *Ferguson* (N. D. Cal., 1969), 302 F. Supp. 1111. The court said that it must follow the decision in *O'Brien, supra*. Several significant holdings of the court are noted. At page 1114, the court said:

"The power to select a flag carries with it the power to do whatever is necessary and proper for carrying into effect this selection. Certainly this would include the power to protect it from contemptuous destruction."

It noted, on the same page, another interest of the government—that of "preserving the loyalty and patriotism represented by the flag."

In flag burning matters, even where such is claimed to be symbolic speech, the court swept the boards clean. It stated the following at 1114:

"* * * even if the burning of the flag was accepted as speech, prohibition of this act would deprive the speaker of no audience or of no other means of reaching her audience."

Frequent reference to the decision in *O'Brien, supra*,

makes it something of a classic decision. The defendant burned his draft card and argued such was "symbolic speech" protected by the First Amendment. In paragraph 3 of the headnotes of 88 Sup. Ct. 1673, it is stated:

" 'Freedom of expression' which [the] First Amendment guarantees does not include all modes of communication of ideas by conduct."

This language appears at page 1678, and then follows:

"We cannot accept the view that an apparently limit-less variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. * * *"

The court held that the power of Congress to raise and support armies is a substantial governmental interest and the furtherance of that interest may produce "incidental restriction" on alleged First Amendment freedoms.

Several cases reflecting the freedom of "expression" concept as properly before a court when refuge is sought under the First or Fourteenth Amendment need to be examined.

One Hodsdon was before several courts resulting from a charge of desecration under a Delaware statute. He was charged with contempt of the flag because he displayed it on the left side of the front of his house, a position subordinate to that given the United Nations flag placed on the right of the house. He first sought help in the federal court (*State of Delaware* v. *Hodsdon* [D. Del., 1967], 265 F. Supp. 308) but that court held that the state law applied and the "proper arena for the vindication of the patriotic sensibilities of the citizens of Delaware is the courts of that State." Resort to the Superior Court of Delaware produced a denial of a writ of prohibition sought as a method of preventing further proceedings on the desecration charge. (*Hodsdon* v. *Superior Court* [1968], 239 A. 2d 222.) Finally, in *Hodsdon* v. *Buckson* (D. Del., 1970), 310 F. Supp. 528, the issue was resolved. The court held that the Delaware statute was vague. Clearly, the court took its stand on the side of "expression," or symbolic speech. At page 536, the court held as follows:

"The statute here challenged includes within its ambit

expression protected by the United States Constitution. The failure of the legislature to regulate with particularity and specificity in this not too clearly charted area of First Amendment rights poses a danger of chilling vigorous and important debate and compels the Court to hold the statute unconstitutional.''

There was no evidence that Hodsdon said a word. Obviously the court is saying that the flag display was "expression" and, although it was not "speech," it was entitled to the protection of the First Amendment.

This extreme view raises rather interesting implications when it is remembered that many acts are "expressions" of feelings or opinions. A punch in the nose may be an expression of disdain for the one punched, or, it may be that a jealous male may make a symbolic speech expressing his strong feelings about unfaithfulness by the female object of his affections in the form of a .38-caliber bullet directed to her breast. Such absurdities demonstrate that there must be limits to the matter of "expression" when courts confuse it with speech.

In contrast, see *Hinton* v. *State* (1967), 223 Ga. 174, 154 S. E. 2d 246, a case which considered a flag on a courthouse campus which was lowered to half mast and then torn from the halyard during a freedom march. Georgia had a desecration statute and the court held the act a violation. The court said, at 177, 154 S. E. 2d 249:

"* * * The language of such statute making it unlawful to mutilate, deface, defile or contemptuously abuse such flags *by any act* is not vague, uncertain or indefinite, and such statutes are accordingly not unconstitutional * * *."

Even though a protest symbol, the act was not protected by the First Amendment.

*People* v. *Radich, supra,* is concerned about certain "constructions," the work of an artist who made use of flags stuffed into various shapes, one being a human body hanging from a yellow noose around its neck, and other even more degrading uses. The court flatly held that freedom of speech did not include a license to desecrate the flag and that the New York statute prohibiting such was not so vague and indefinite as to violate the due process clause.

The *Radich* decision is significant. It clearly puts "acts" in the area for proper examination as to any restrictive desecration statute. The *Radich* court held that the question is not one of First Amendment protection but quite properly one of a denial of due process.

Two District of Columbia Court of Appeals decisions deserve note; *Joyce* v. *United States* (D. C. Cir., 1969), 259 A. 2d 363, and *Hoffman* v. *United States* (D. C. Cir., 1969), 256 A. 2d 567. In *Joyce*, the court held the desecration statute constitutional and affirmed the conviction of the defendant, who ripped a small flag off a post, tore it, tied it to his index finger, and waved it as part of the v-symbol. In *Hoffman*, the defendant wore a shirt "resembling" a flag. The Court of Appeals affirmed a conviction for "defiling." The defense raised the vague and indefinite argument. Paragraphs 1 and 3 of the syllabus read as follows:

"Statute violates due process of law if it is so vague and standardless that it leaves public uncertain as to conduct it prohibits, but statute is not required to be drawn with precision of chemical formula or mathematical equation."

"Statute proscribing knowingly casting contempt upon any flag of United States by publicly mutilating, defacing, defiling, burning, or trampling upon it is not unconstitutionally vague."

Again the emphasis of the court is on due process, not First Amendment protection.

The decision in *Giboney* v. *Empire Storage & Ice Co.* (1949), 336 U. S. 490, unequivocally holds a Missouri law against peaceful picketing, in certain cases, not to be a violation of the First Amendment.

Somewhere in that spread between "pure speech" on the one hand, and "symbolic speech," or expression, on the other, we find cases like *Long Island Vietnam Moratorium Comm.* v. *Cahn* (E. D. N. Y., 1970), 322 F. Supp. 559, involving the New York desecration statute, which bars placing a figure on a United States flag, and in which the court held that a peace symbol imposed on a flag did not violate the law. The court said that the thrust of the statute is to

prohibit any disfiguration or alteration of the flag itself or prevent commercial exploitation for private benefit. A strong dissent looks to *Radich, supra,* as support for its position, and distinguishes the fact pattern from that in *Street, supra.* The dissent held that the statute bars misuse, which is defined as "placing 'any' figure" of "any nature" on "any" flag of the United States.

Two more cases in the spread are noted; *Commonwealth* v. *Sgorbati* (1970), 38 U. S. L. W. 2617, and *Schacht* v. *United States* (1970), 398 U. S. 58. In *Sgorbati*, a lad about to be inducted into military service appeared at the center wearing shorts with an American flag draped over his shoulders. The court held he was not in violation of the Pennsylvania statute. The court did not hold the act unconstitutional, but simply held that the defendant was not in violation thereof, although he said he didn't like the war but averred he loved his country. Schacht participated in a skit in front of an induction center opposing the Vietnam war. He wore a military uniform, which is permitted by United States statute if such does not discredit the uniform. The court held that the defendant was protected by the First Amendment since it was not shown that the theatrical portrayal discredited the armed forces. The distinction of acting and "speech" which protest the war but do not discredit the services is reasonably drawn.

The "symbolic speech" concept is reflected in a number of cases which have nothing to do with flag desecration but are used in support of the contention that the "symbol" is under the protective wing of the First Amendment. Typical of this group is *Stromberg* v. *California* (1931), 283 U. S. 359, concerned with a California statute which condemns displaying a red flag in a public or meeting place as a symbol of opposition to organized government, etc. The court held the act invalid on its face.

*Tinker* v. *Des Moines School Dist.* (1969), 393 U. S. 503, is another such case. School pupils were suspended from school for violating a school rule by wearing black arm bands deploring the war. The majority of the United States Supreme Court held that the school authorities could not

"anticipate disruption" to school activities, and that the constitution protected the form of "expression" used—i. e., arm bands were an expression of opinion. There were many emphases in the release of the court. Justice Stewart concurred, but felt that a board may restrain a child who has not yet attained the capacity to choose, prudently, a capability the First Amendment presumes. Justice White, also concurring, said that the court recognizes communication by words and communication by acts. Two dissenters, Black and Harlan, held that the constitution does not compel teachers and officials to surrender control to students, and school officials have authority to maintain discipline. The two dissents made no reference to First Amendment protections or due process.

Civil rights demonstrations are part of the spectrum also. Typical of this group of decisions are *Cox* v. *Louisiana* (1965), 379 U. S. 559, and *Cox* v. *Louisiana* (1965), 379 U. S. 536. A Louisiana statute prohibited picketing near a courthouse. Cox and others were arrested for a violation. They argued that the law abridged their rights under the First and Fourteenth Amendments. The court held that the conduct in question is distinguished from pure speech and, therefore, no infringment of rights of free speech or assembly occurred. The conviction of Cox was reversed in a restaurant "sit-in" case on the ground that the breach of the peace law invoked was vague and therefore unconstitutional. It was stated, however, in paragraph 3 (d) of the syllabus, at page 537:

"Communication of ideas by picketing and marching on streets is not afforded the same kind of protection under the First and Fourteenth Amendments as is pure speech."

In *Adderley* v. *Florida* (1966), 385 U. S. 39, demonstrators were arrested as trespassers when they did not leave the premises when told by the sheriff to do so. The court held that the trespass law was not as vague as the old common-law trespass rule and that the First Amendment could not be invoked since there was no evidence that the sheriff objected to anything that was sung or said.

Pure speech is not always under the cover of the

First Amendment. A New Hampshire law forbidding one to address an "offensive, derisive or annoying word" to a person on the street was under review in *Chaplinsky* v. *New Hampshire* (1942), 315 U. S. 568. Under the Act, one could not call another by "any offensive or derisive name." The state court held that it was a breach of the peace to call one, on the street, a "damned Fascist" or a "damned racketeer." The conviction was affirmed, the Supreme Court holding that the violation was a breach of the peace and not violative of the First Amendment.

This group of cases calls attention to a question raised as to restrictive legislation, including the desecration statutes. Just why should government exercise authority in any of these areas is the query. The question of the interest of the government in flag desecration legislation is raised in several of the decisions reviewed and in others. There seems to be little doubt as to the interest of the federal government in the matter. Courts seem to accept the answer that the national adoption of a flag carries with it the right to protect it, to say nothing of the necessity of supporting the military establishment by encouraging respect of the flag and resultant patriotic spirit.

The right of the state to legislate is less generally accepted. Common sense suggests that laws regarding respect for the flag are an exercise of the police power of the state and are intended to forestall disturbances. In some situations, the possibility of a disturbance seems remote, as in the instant case. As long as the young man involved was seated in his car, the risk of arousing patriotic ire was far less, certainly, than if he had worn the pants to an American Legion convention. It would seem, however, that if he had worn his jeans frequently before the "representation" was placed over the hole he had worn in them, the likelihood was that he appeared in public after the attachment, creating the possibility of an offense to one devoted to his flag. States, too, have a national guard to encourage, and in addition to discouraging breaches of the peace, patriotic, respectful citizens make for generally orderly government—a legitimate objective for the exercise of police power.

Counsel for the defendant relies heavily upon a recent Ohio decision in a flag desecration case, suggesting that the decision of the Sixth District Court of Appeals in *State* v. *Saionz* (1969), 23 Ohio App. 2d 79, is dispositive of the case here considered. In summarizing the fact pattern, that Court of Appeals said that the evidence was that Saionz wore a flag as a cape and "[s]omeone other than the defendant had cut a slit in it, made burn marks, and attached a peace button thereon." The defendant, it would seem the Court of Appeals concluded, simply put his head through the slit and wore the flag. The majority of the court applied the doctrine *ejusdem generis* and concluded that the mere wearing was an "otherwise" act which was not similar in nature to "physical destruction or abuse," like the named acts of mutilating, burning, destroying, defiling, defacing or trampling upon. The dissent, however, finds difficulty in accepting the conclusions of the majority and emphasizes that the wearing of the flag "in its mutilated condition," as a cape, clearly cast contempt.

Whether the decision in *Saionz* is approved or not, it is not controlling in this case. There is nothing in this record to indicate that anyone other than the defendant had a part in the incident, from the hole in the jeans to the placement of the patch near the crotch—a portion of man's anatomy commonly involved in expressions of disdain. The defendant made the representation, perhaps, to try out his wife's sewing machine or to satisfy his artistic urge. Whatever, he came up with a flag, when a hammer and sickle, or even daisies or forget-me-nots, were equally artistic if not "fashionable," and sat upon the flag attached to the seat of his pants, which is as physical an act as "trampling upon."

The cases commented upon, and many others, present a wide range of judicial opinion and reflect a variety of basic legal philosophies. There is the view of the conservative, traditional, historic legalist who believes that "pure speech," including printing and writing, is all that is protected by the First Amendment. The more modern position, of the liberal, activist philosophy, is also represented.

32 

The "pure speech" concept and position (*Street, O'-Brien, Giboney, Cox* and *Adderly*) is akin to that taken in those courts which take the position that an act alone cannot be considered speech and therefore is not within the purview of the First Amendment (*Cowgill, Ferguson, O'-Brien, Hinton, Radich, Joyce* and *Hoffman*). At the other extreme are those courts which speak not of "speech" but of "expression" and "symbolic speech," and suggest that devices and acts can take cover under the First Amendment (*Cowgill, Miller, Ferguson, O'Brien* and *Hodsdon*). Moving toward the pure speech view are those jurists who suggest that when words and speech are combined there is protection (*Cowgill, O'Brien, Miller* and *Cox*), and there are those as well who equivocate on review because it cannot be ascertained whether the trial court reached the conclusion it did because of speech or act (*Street*). And, then, there are those varieties of decisions, of which there are a multitude and in which the accused seek to take cover under the presumed broad expanse of the First Amendment, which have stated that there is no protection, or in which a court correctly has held that the act involved might well be within the due process purview of the Fourteenth Amendment or covered by a combination of the First and Fourteenth Amendments. (*Radich, Hoffman, Stromberg, Tinker* and *Cox.*) Also, in every attempted classification (as there must be) there are those decisions arrived at because of some peculiarity in the fact pattern which produces a result which appears strained when an attempt is made to fit it into any given category (*Cowgill, Ferguson, Long Island, Sgorbati* and *Schacht*). Even pure speech is not always protected (*Chaflinsky*).

This review is concerned with an act. No words appear anywhere in the fact pattern. It is argued that the representation was symbolic. One writer suggested that when pure speech is protected, a symbol carrying the same message is likewise protected. Assuming the validity of that hypothesis, no message is apparent in the instant case. If there is a protest or complaint, or expression of opinion, beamed in the direction of government or people, it is completely obscure in the instant case. The only reason-

able explanation for the creation of the representation of the flag, and the wearing of it on the "behind" of the creator, was an intention to defile and cast contempt on the flag of the United States by trampling upon it, not with his feet, but with his body—that portion of which is commonly alluded to in vulgarisms to show either disdain or contempt.

For the reasons expressed, and especially because assignments of error Nos. 2 and 3 rely solely upon First Amendment protections which do not encompass an act which if improperly restrained by statute invokes the Fourteenth Amendment, the defendant's assignments of error are overruled.

The defendant in this case said that he meant no contempt. But nowhere does the transcript reveal an expression of regret or assurance to the trial court that such act would not happen again, which might have established the sincerity of the young man before the court. On the contrary, the defendant asserted that patriotic colors were "pretty stylish" and that he was "not in any more contempt than the policemen wearing them on the shirts," but we failed to note that the shoulder patch and the flag on the breast of a shirt is a place of honor and respect in contrast to the seat of the britches.

Thus, what might have been regarded as a thoughtless incident attained the proportions of a gigantic constitutional issue, "equal protection" having provided unlimited free legal services which accomplished the inflation. The equal protection concept is in need of much clarification when it reaches the point when the poor man gets more than the rich man, in exercising prudence, could afford to buy.

*Judgment affirmed.*

HOLMES and WHITESIDE, JJ., concur.

WHITESIDE, J., concurring. Although I completely concur with Judge Troop's decision, I feel additional comments are in order.

In *State, ex rel. Sensenbrenner, v. Adult Book Store* (1971), 26 Ohio App. 2d 183, we pointed out the inaccuracy

of referring to an incorporation of the First Amendment into the Fourteenth Amendment. Rather, more precisely, "the liberties or freedoms guaranteed by the First Amendment are among the liberties protected by the Fourteenth Amendment." This follows from the long standing determination that the due process clause of the Fourteenth Amendment includes substantive as well as procedural due process.

However, even arguendo assuming direct incorporation, the First Amendment should be examined. It provides that:

"Congress shall make no law * * * abridging the freedom of speech, or of the press * * *."

While the First Amendment also includes the freedoms of religion, of assembly, and of petition, with regard to the freedom of speech, it states no more, no less, than that stated above. The First Amendment guarantees the "freedom of speech." A referral to Webster's Third New International Dictionary and to the World Book Dictionary indicates that the lexicographers have had no difficulty in understanding that the word "speech" refers to the spoken word. It has only been certain jurists, certain members of the legal profession, and certain others wishing to expand the application of the freedom of speech, who have had difficulty in limiting the word "speech" to its natural meaning. The lexicographers have necessarily carried this attitude over into their definition of the term "freedom of speech."

The First Amendment does not recognize, much less guarantee, the "freedom of expression." Rather, it recognizes only two methods of expression: speech and press. While counsel for defendant has correctly asserted that the interpretation doctrine of *ejusdem generis* should be applied to the statute herein involved, he fails to suggest that the doctrine of *expressio unius est exclusio alterius* should be applied to the First Amendment. This doctrine means that the expression of one thing is necessarily the exclusion of others. In other words, when one thing is mentioned in a statute or constitutional provision, it is intended not to include others not mentioned.

The First Amendment guarantees the freedom of two methods of expression—this means that it does not guarantee any other means of expression if we are to apply the doctrine of *expressio unius*. We cannot assume that the framers of the amendment were so uninformed as not to recognize the existence of other forms of expression. To add to the language and expand the freedom of speech and press to mean "freedom of expression" is to amend the constitution itself. No court has the power or right to amend the constitution. Any decision of any court so attempting is itself unconstitutional.

The portion of the statute herein involved providing: "No person shall * * * otherwise cast contempt upon such flag * * *" necessarily involves "expression." No one can "cast contempt" unless he, by word or act, "expresses" contempt. However, the First Amendment cannot be involved when such contempt is cast by an act rather than by word. The First Amendment guarantees the "freedom of speech" not "the freedom of expression" and not the "freedom of committing acts expressing ideas or attitudes."

These conclusions, while precluding the application of the First Amendment, do not preclude the application of the Fourteenth Amendment. As stated above, long-standing determinations have established that the due process clause of the Fourteenth Amendment includes substantive as well as procedural due process. Thus, while an act of expression does not constitute speech protected by the First Amendment, it may well fall within the substantive liberty protected by the Fourteenth Amendment against intrusion without substantive due process of law. This requires that a limitation of an individual's liberties can be made only when such limitation "bears a real and substantial relation to the public health, safety, morals or general welfare of the public," and if it is "not unreasonable or arbitrary." *Benjamin* v. *Columbus* (1957), 167 Ohio St. 103.

I concur in the judgment that, in this instance, there has been no unconstitutional intrusion upon defendant's liberties without due process of law, in violation of the Fourteenth Amendment.