Diane MONROE, Petitioner-Appellant,

v.

STATE COURT OF FULTON COUNTY, James Webb, Solicitor of Fulton County, and Michael Bowers, Attorney General of Georgia, Respondents-Appellees.

No. 83–8737.

United States Court of Appeals, Eleventh Circuit.

Aug. 20, 1984.

Stephanie Kearns, Atlanta, Ga., for petitioner-appellant.

Donald C. English, Atlanta, Ga., for State Court and Webb.

Susan V. Boleyn, William B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for Bowers.

Before TJOFLAT and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

On September 17, 1980, appellant, Diane Monroe, was convicted in State Court of Fulton County for misuse of the national flag in violation of a Georgia statute, Ga. Code Ann. § 26–2803, and was sentenced to twelve months imprisonment. Monroe was released from custody after posting an appeal bond. The Georgia Supreme Court affirmed her conviction. *Monroe v. State,* 250 Ga. 30, 295 S.E.2d 512 (1982). On January 28, 1983, Monroe filed a petition for writ of habeas corpus and a motion for stay of her sentence in the United States District Court for the Northern District of Georgia. The district court denied her motion for stay on April 4, 1983 and Monroe began serving her sentence on April 14, 1983. The district court denied the petition for writ of habeas corpus on September 21,

1983. *Monroe v. State Court of Fulton County,* 571 F.Supp. 1023 (N.D.Ga.1983). Because we hold that the Georgia statute is unconstitutional as applied, we reverse the denial of appellant's petition for writ of habeas corpus.

## I. BACKGROUND

The relevant facts, as summarized by the Georgia Supreme Court, are as follows:

On November 29, 1979 two officers from the City of Atlanta Police Department were dispatched to the federal courthouse on Forsyth Street to observe a demonstration by the Iranian Student Association and the Revolutionary Communist Party "against the United States' involvement in Iranian affairs." Trial testimony by these officers indicated that from their parked patrol car they observed a number of persons peacefully picketing and, in turn, making speeches. During this time the officers were approached by Reuben Garland, a local attorney, who expressed his desire to press charges against the group. The officers testified that while they were discussing this matter with Mr. Garland they observed [Diane Monroe and another individual] unfurl a United States flag. Defendant Monroe ignited the flag with a cigarette lighter, but the flame went out. [Another individual] then took the lighter from Monroe and ignited the flag. When Garland observed these proceedings he ran into the crowd of demonstrators and began struggling for control of the flag. At that point police officers attempted to disperse the demonstrators and extinguish the burning flag.

250 Ga. 30, 30–31, 295 S.E.2d 512 (1982).

The Georgia statute under which Monroe was convicted provides that "[a] person who deliberately mutilates, defaces, or defiles the flag of the United States ... is guilty of a misdemeanor." Ga.Code Ann. § 26–2803.[1] *Monroe does not challenge the*

---

**1.** A number of states have adopted some form of a flag desecration statute. *See* Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment

Analysis, 88 Harv.L.Rev. 1482, 1502 n. 78 (1975). A federal flag desecration statute penalizes "[w]hoever knowingly casts contempt upon any flag of the United States by publicly mutilat-

constitutionality of the state statute on its face; she challenges it only as applied to her. Monroe claims that her conviction under the statute violates her right to free speech under the first and fourteenth amendments.[2]

## II. DISCUSSION

■ First, we must decide whether Monroe's act of burning the flag was a type of symbolic speech within the purview of the free speech clause of the first amendment. Nonverbal expression may be a form of free speech entitled to first amendment protection. *See Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (attaching peace sign to flag is form of free speech); *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands in school is akin to pure speech); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (compulsory flag salute is form of utterance); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (display of red flag is a form of protected speech); *Leonard v. City of Columbus*, 705 F.2d 1299 (11th Cir.1983) (police officers removing American flags from uniforms is protected speech); *Smith v. United States*, 502 F.2d 512 (5th Cir.1974) (wearing peace pin is within the free speech protection). The Supreme Court for decades has recognized that the flag is a symbol with special communicative connotations. *Spence v. Washington*, 418 U.S. at 410, 94 S.Ct. at 2730. In *West Virginia*

*State Board of Education v. Barnette*, 319 U.S. at 632–33, 63 S.Ct. at 1182–83, the Court stated: "Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind." The Supreme Court does not, however, "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).

■ To determine whether appellant's conduct is entitled to first amendment protection, "the nature of appellant's activity, combined with the factual context and environment in which it was undertaken" must be considered. *Spence v. Washington*, 418 U.S. 405, 409–10, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d 842 (1974). If appellant shows "[a]n intent to convey a particularized message ... and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it," *id.* at 410–11, 94 S.Ct. at 2730–31, the activity falls within the scope of the first and fourteenth amendments.[3]

■ In the case before us, Monroe was convicted for burning the American flag during a public demonstration protesting the United States's involvement in Iranian affairs. As noted by the Georgia Supreme Court, at the date of the demonstration, November 29, 1979, relations between the

---

ing, defacing, defiling, burning, or trampling upon it...." 18 U.S.C. § 700(a). 18 U.S.C. § 700(c) expressly provides that the state statutes are not preempted by the federal flag desecration statute.

In the late 1960's and early 1970's, there were a great number of cases involving violations of state and federal flag desecration statutes. For a list of such cases, *see Smith v. Goguen*, 415 U.S. 566, 583–84 n. 1, 94 S.Ct. 1242, 1252–53 n. 1, 39 L.Ed.2d 605 (1974) (White, J., concurring).

**2.** The first amendment is applicable to the states by virtue of the fourteenth amendment. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925).

**3.** One commentator has defined symbolic conduct as follows:

First, the conduct should be assertive in nature. This will generally mean that the conduct is a departure from the actor's normal activities and cannot adequately be explained unless a desire to communicate is presumed. Second, the actor must have reason to expect that his audience will recognize his conduct as communication. Third, communicative value does not depend on whether the idea sought to be expressed can be verbalized. The symbolism or medium may be an idea in itself.

Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1117 (1968).

United States and Iran were sensitive. 250 Ga. 30, 30 n. 1, 295 S.E.2d 512. Monroe burned the flag during a demonstration in which she had participated, and thus, it is clear that Monroe intended to convey a particularized message: her dissatisfaction with the United States's policies. Because the flag was burned during a larger demonstration that involved picketing and speeches, the likelihood that Monroe's message would be understood by those who viewed it was great. Her act was not one of "mindless nihilism." *Spence v. Washington*, 418 U.S. at 410, 94 S.Ct. at 2730. As in *Spence*, Monroe's act was a "pointed expression of anguish" about the foreign affairs of her government. *Id.* Therefore, we conclude that Monroe's burning of the flag constituted speech and symbolic expression within the purview of the first amendment.

■ Having concluded that Monroe's conduct was a form of speech, however, does not mean that any infringement on her freedom of expression would be unconstitutional. The first amendment ban against the making of laws abridging free speech is not absolute. *See, e.g., Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (obscene material is not protected by the first amendment); *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (draft card burning is not constitutionally protected activity); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words are not protected speech).

Although the Supreme Court has not ruled on the constitutionality of convictions for politically inspired destruction of the American flag, it has had occasion to discuss closely related issues.

In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), appellant burned his selective service registration certificate in protest against the

Vietnam conflict. He was convicted under a section of the Selective Service Act providing for the punishment of one who "knowingly destroys, [or] knowingly mutilates" such a certificate. The Court rejected O'Brien's contention that his conviction violated the first amendment. The Court found that the Act was constitutional because it met the following four requirements: 1) it was within the constitutional power of the government; 2) it furthered an important or substantial governmental interest; 3) the governmental interest was unrelated to the suppression of free expression; and 4) the incidental restriction on alleged first amendment freedoms was no greater than was essential to the furtherance of that interest. *Id.* at 377, 88 S.Ct. at 1679.

In applying the four criteria, the *O'Brien* Court found that the governmental interest was in preventing harm to the smooth and efficient functioning of the Selective Service System. When O'Brien deliberately destroyed his registration card, he willfully frustrated that governmental interest. "For this noncommunicative impact of his conduct, and for nothing else, he was convicted." *Id.* at 382, 88 S.Ct. at 1682.[4] According to the Court, "[t]he case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." *Id.*

In *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), appellant, upon hearing of the shooting of James Meredith, a civil rights leader, carried his American flag into the street and burned it, shouting "We don't need no damn flag," and "If they let that happen to Meredith we don't need an American flag." The State of New York convicted him under a statute making it a crime to "publicly ... cast contempt upon [any American flag] by words." The Supreme Court reversed,

---

**4.** The Court cited other examples of statutes directed solely at noncommunicative conduct: "A law prohibiting destruction of Selective Service certificates no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records." 391 U.S. at 375, 88 S.Ct. at 1678.

holding that the state statute "was unconstitutionally applied in appellant's case because it permitted him to be punished merely for speaking defiant or contemptuous words about the American flag." *Id.* at 581, 89 S.Ct. at 1360. The Court stressed that it was not passing upon the validity of appellant's conviction insofar as it was sustained by the state courts on the basis that appellant could be punished for his burning of the flag. *Id.* at 594, 89 S.Ct. at 1366.

In *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), a college student hung an American flag upside down from the window of his apartment with a removable black tape peace symbol attached to it. Police officers who happened to observe the flag went to his apartment and arrested him. No public demonstration was involved. Appellant was convicted under the State of Washington's flag "improper use" statute, not the desecration statute. At trial, appellant testified that he had put the symbol on the flag in protest against the invasion of Cambodia and the killings at Kent State University. The Supreme Court found there to be little doubt that appellant's activity constituted communication within the scope of the first and fourteenth amendments. *Id.* at 409–10, 94 S.Ct. at 2729–30. Finding that appellant's conduct was within the ambit of protected speech, the Court then held that no state interest had been sufficiently impaired by appellant's activity to support the conviction. *Id.* at 412–15, 94 S.Ct. at 2731–33. Hence, the Court in *Spence* adopted a two-step analysis: first, a determination of whether the conduct is within the protections of the first amendment; and second, whether, upon the record of the given case, the interests advanced by the state are so substantial as to justify infringement of constitutional rights.

To determine whether to apply the framework of *O'Brien* or *Spence,* we must examine the state's asserted interests. One of the criteria of *O'Brien* is that the governmental interest must be unrelated to the suppression of free expression. Thus, if the state's interests are related to the suppression of free speech, this criterion under *O'Brien* is not met and instead, *Spence* will apply. *Spence v. Washington,* 418 U.S. at 414 n. 8, 94 S.Ct. at 2732 n. 8. The state asserts two interests in suppressing Monroe's activity: 1) the protection of the national flag as a symbol; and 2) the prevention of breaches of the peace.[5] We conclude that both interests to the extent that either or both of them were sought to be implemented by the prosecution in this case are related to the suppression of free speech and accordingly, that *Spence* applies.

The state's interest in protecting the integrity of the national flag is not unrelated to the suppression of free speech. As pointed out by Judge Browning:

> The physical destruction of a flag—the noncommunicative element of the prohibited conduct—affects no governmental interest. The value of the flag as a symbol is not diminished by the physical destruction of one flag or of many. The government is interested only in the suppression of the public display of defiance and contempt for the flag—the communicative element of the prohibited conduct—for it is thought that the value of the flag as a symbol may be adversely affected by the public manifestation of such attitudes.

*United States v. Crosson,* 462 F.2d 96, 108 (9th Cir.) (Browning J., dissenting), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 569, 34 L.Ed.2d 517 (1972). *See also Spence v. Washington,* 418 U.S. at 413–14, 414 n. 8,

---

5. Monroe contends that we should not consider prevention of breach of the peace as a state interest because the Georgia Supreme Court did not mention this interest in affirming her conviction. For purposes of this appeal, we will assume that prevention of breach of the peace is a State of Georgia interest. *See Spence v. Washington,* 418 U.S. 405, 412, 94 S.Ct. 2727, 2731, 41

L.Ed.2d 842 (1974) ("We think it appropriate to review briefly the range of various state interests that might be thought to support the challenged conviction"); *Street v. New York,* 394 U.S. 576, 590–91, 89 S.Ct. 1354, 1364–65, 22 L.Ed.2d 572 (1969) ("We can think of four governmental interests which might conceivably have been furthered").

94 S.Ct. at 2731–32, 2732 n. 8; Nimmer, The Meaning of Symbolic Speech Under the First Amendment, 21 U.C.L.A. L.Rev. 29, 57 (1973). *But see Sutherland v. DeWulf,* 323 F.Supp. 740, 745 (S.D.Ill.1971) (state's interest in preserving flag as symbol is unrelated to the suppression of free expression).

Nor is the state's interest in preventing a breach of the peace unrelated to the suppression of free speech. As Professor Nimmer has stated:

In the context of flag desecration, it is precisely the particular idea conveyed by the act of desecration that it is feared will lead to a violent or unlawful reaction. Thus, insofar as the governmental objective is the suppression of the communication of an idea in order to avoid resulting violence, it is an anti-speech interest, *i.e.,* an interest in the suppression of speech.

(footnotes omitted). Nimmer, *supra,* at 53–54. *But see Sutherland v. DeWulf,* 323 F.Supp. 740, 745 (S.D.Ill.1971) ("interest of the states, in preserving the public peace, is totally unconnected to the suppression of free expression").

Having adopted the framework of *Spence,* we must determine whether the state's interests are so substantial as to justify infringement of Monroe's constitutional rights.

The first interest advanced by the state to support its position is the protection of the flag as the symbol of the nation. The Georgia Supreme Court explained that the state has a unique and compelling interest in protecting the flag because as a symbol of the nation, the flag belongs collectively to the people of the various states. Accordingly, the state's interest extends to regulating conduct which seeks to destroy the symbol by destroying copies of it. 250 Ga. at 32, 295 S.E.2d 512. The district court found that the state's interest in protecting the integrity of the national flag is only material, not substantial. 571 F.Supp. at 1027. We conclude, however, that the state's interest is not sufficiently substan-

tial as to justify infringement of Monroe's constitutional rights.

The Supreme Court has held that under the first amendment, the government has no legitimate interest in compelling an individual to express respect for the flag and what it symbolizes. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In *Barnette,* the Supreme Court held that the flag salute was symbolic speech, and the government could not require an individual to salute the flag in the interest of national unity. As pointed out by Judge Browning in his dissent in *United States v. Crosson,* 462 F.2d at 105, there is no significant difference between *Barnette,* in which the government sought to *compel* the expression of *respect* toward the flag and this case, in which the government seeks to *prevent* the expression of *disrespect.* "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." *Barnette,* 319 U.S. at 632–33, 63 S.Ct. at 1182–83.

A similar notion was conveyed by the Supreme Court in *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). In *Street,* the Court considered the state's interest in assuring that the appellant showed proper respect for the national emblem. The Court, which held that this interest could not support the conviction, noted that the Constitution "encompasses the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous." *Id.* at 593, 89 S.Ct. at 1366.

The only difference between *Street* and this case is that Street was convicted of having "cast contempt upon [the flag] by words," while Monroe was convicted of deliberately mutilating, defacing, or defiling the flag. But direct governmental regulation of nonverbal expression should be subject to the same limitations under the first amendment as direct regulation of verbal expression. Thus, we hold that the state's interest in protecting the flag as a symbol is not so substantial

as to permit the state to infringe on Monroe's right to free speech.

■ The second interest asserted by the state is prevention of breaches of the peace. Clearly, the state has a valid interest in preventing breaches of the peace that might arise from certain acts of flag desecration. *Street v. New York*, 394 U.S. at 590–92, 89 S.Ct. at 1364–66; *Jones v. Wade*, 479 F.2d 1176, 1179 (5th Cir.1973), *reversed and remanded on other grounds*, 504 F.2d 427 (5th Cir.1974). Some courts have concluded that acts of flag desecration are, of themselves, always so inherently inflammatory that the state may act to prevent a danger to the public peace.[6] Other courts have concluded that an act of flag desecration alone is insufficient provocation to abridge first amendment rights; rather, the state must introduce other objective evidence that demonstrates the imminence of public unrest or a clear and present danger of breach of the peace.[7] We hold that the latter view is required under the Constitution.

■ A function of free speech is to invite dispute. *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). "[F]reedom of speech, though not absolute, ... is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.... There is no room under our Constitution for a more restrictive view." *Id.* at 4–5, 69 S.Ct. at 895–96. *See*

also *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 633, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943).[8] Only if violent acts are both likely and imminent as a result of the speech may the speech be suppressed. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969).

■ Monroe's act of burning the flag, which we have concluded was symbolic speech, did not produce a clear and present danger of a serious substantive evil. There was no evidence demonstrating the likelihood and imminence of public unrest. As the district court noted, a single spectator's struggling for control of the flag was at most, a "minor" breach. Simply because the spectator was annoyed or disturbed is not sufficient to restrict appellant Monroe's first amendment rights. Although there may have been a risk of dispute, this risk "is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines School District*, 393 U.S. 503, 508–09, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969).

Nor does this case come within the standard set out in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942), in which the Court held that it will permit punishment of speech if the remarks come within the class of "fighting words" which are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace."

6. *See, e.g., Sutherland v. DeWulf*, 323 F.Supp. 740, 745 (S.D.Ill.1971); *State v. Royal*, 113 N.H. 224, 305 A.2d 676, 680 (1973); *State v. Mitchell*, 32 Ohio App.2d 16, 288 N.E.2d 216, 226 (1972); *State v. Waterman*, 190 N.W.2d 809, 811–12 (Iowa 1971).

7. *See, e.g., United States ex rel. Radich v. Criminal Court*, 385 F.Supp. 165, 180–82 (S.D.N.Y. 1974); *Cline v. Rockingham County Superior Court*, 367 F.Supp. 1146, 1151–53 (D.N.H.1973), *aff'd*, 502 F.2d 789 (1st Cir.1974); *Crosson v. Silver*, 319 F.Supp. 1084, 1088 (D.Ariz.1970); *Hodsdon v. Buckson*, 310 F.Supp. 528, 535 (D.Del.1970), *rev'd on other grounds*, 444 F.2d 533 (3d Cir.1971); *People v. Vaughan*, 183 Colo. 40, 514 P.2d 1318, 1323 (1973); *State v. Kool*,

212 N.W.2d 518, 521 (Iowa 1973); *People v. Von Rosen*, 13 Ill.2d 68, 147 N.E.2d 327, 329 (1958).

8. The "clear and present danger" test was first enunciated by the Supreme Court in *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), in which the Court stated that the object was to determine "whether the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *See also Gitlow v. New York*, 268 U.S. 652, 672–73, 45 S.Ct. 625, 632–33, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting). *See generally* Note, 68 Colum.L.Rev., *supra*, at 1118–21.

No spectator could reasonably have regarded Monroe's communicative conduct as a direct personal insult. *See Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971) (words "Fuck the Draft" on defendant's jacket were not fighting words); Nimmer, *supra,* at 55 ("Expression of an unpatriotic point of view, no matter how offensive to the viewer, does not fall within the 'fighting words' category." (footnote omitted)).

As the Court stated in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 641–42, 63 S.Ct. 1178, 1186–87, 87 L.Ed. 1628 (1943):

> The case is made difficult not because the principles of its decision are obscure but because the flag involved is our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization.... [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

Although Monroe's opinions and her means of expressing her ideas are doubtless highly unpopular, her right to express her beliefs is guaranteed by the Constitution. We hold that Ga.Code Ann. § 26–2803 is unconstitutional as applied to Monroe.

Accordingly, the judgment below is REVERSED.