Gene THOMPSON, Plaintiff,

v.

The CITY OF CLIO, et al., Defendants.

Civ. A. No. 90–T–908–N.

United States District Court,
M.D. Alabama, N.D.

May 2, 1991.

Bruce Maddox, Paul R. Knighten, Montgomery, Ala., for plaintiff.

H.E. Nix, Jr., Alex Holtsford, Montgomery, Ala., for defendants.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Gene Thompson, a member of Clio, Alabama's city council, has brought this civil rights action against the city, its mayor, Bobby R. Cox, its police chief, Robert Ramsey, and police officers David Hinson and Richard Johnson, claiming that the defendants violated federal and state law

by physically seizing his tape recorder during one city council meeting and forcibly removing him from another. Thompson rests his federal claims on the first and fourth amendments to the United States Constitution, as enforced through 42 U.S.C.A. § 1983 (West 1981), and his state law claims on Alabama law.[1] The court has jurisdiction over Thompson's federal claims under 28 U.S.C.A. §§ 1331 (West Supp. 1991) and 1343 (West Supp.1991) and over his state claims under the doctrine of pendent jurisdiction.

This cause is now before the court on defendants' motion for summary judgment. For the reasons set forth below, the court concludes that the motion should be denied, except with respect to Thompson's claim under the Alabama "open meetings" law, which is due to be dismissed.

## I.

The facts in this case are brief, straightforward, and for the most part undisputed. Since 1988, when defendant Cox was elected mayor of Clio, he and Thompson, who was voted to the city council during the previous administration, have experienced political differences. Soon after Cox assumed office, Thompson began tape recording council proceedings because he did not trust the city clerk to keep accurately the minutes of these meetings. Cox initially voiced no objection to Thompson's use of a cassette recorder. However, in February 1990, a citizen who had apparently listened to a portion of one of Thompson's tapes appeared at city hall and complained bitterly and in harsh language to the city clerk about a water meter fee recently imposed by the council. This confrontation grew heated and the citizen agreed to leave only after the clerk displayed a gun.

Reacting to this incident and other information that Thompson "had used his tape recording to give various people around town false impressions," and in order to prevent future "disturbances," Cox decided that Thompson would no longer be permitted to tape record council sessions. Accordingly, at the April meeting, Cox informed Thompson that he could not keep his recorder in the council room. When Thompson refused to relinquish the device, Cox ordered defendant Police Chief Ramsey to confiscate temporarily Thompson's recorder. Ramsey removed the tape recorder from the table where Thompson was seated and placed it outside the meeting room. Thompson remained in the room and retrieved the recorder after the session had ended.

Thompson claims that after this incident he contacted the offices of the Alabama attorney general, the League of Municipalities, and the Clio city attorney, and was told that he was entitled to tape record council sessions. At the subsequent May meeting of the council, Thompson again appeared with his audio recorder and was again told by Cox that he would not be permitted to record the meeting. When Thompson refused to part with the tape machine, protesting that it was his right to record the council's proceedings, Cox instructed police officers Johnson and Hinson to seize the device.[2] At this point, the parties' accounts of events diverge. According to defendants, Thompson chose to leave the meeting before Johnson and Hinson could carry out Cox's order, and the officers therefore neither removed the recorder nor used any force against Thompson. Thompson, on the other hand, contends that Johnson and Hinson physically removed him from the council room and

---

**1.** Section 1983, in relevant part, provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**2.** There is some evidence in the record that several of the parties, including Thompson, were speaking in a loud voice and using harsh language, including words such as "damn." However, it appears that the confrontation did not escalate to this level until Johnson and Hinson had initiated efforts to confiscate the cassette player.

thereby injured his arm, requiring him to seek medical treatment.

In August 1990, Thompson filed this lawsuit, alleging that defendants violated his rights under the fourth amendment to the United States Constitution by seizing his person and his cassette recorder. Thompson also included in his complaint state law claims of conversion, false arrest, assault and battery, and violation of Alabama's "open meetings law." [3] In February 1991, the court permitted Thompson to amend his complaint to add a claim that defendants have violated his right to freedom of speech, as guaranteed by the first amendment, by preventing him from recording council sessions.[4] Thompson seeks declaratory and injunctive relief as well as compensatory and punitive damages. Defendants have now moved for summary judgment on each count of Thompson's complaint as amended.[5]

## II.

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A moving party can meet this standard, in a case in which the ultimate burden of persuasion at trial rests on the non-moving party, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the non-moving party's evidence itself is insufficient to establish an essential element of his claim. The movant may make this showing by deposing the non-moving party's witnesses, by establishing the inadequacy of the documentary evidence or, if there is no evidence, by reviewing for the court the facts that exist to show why they do not support a judgment for the non-moving party. The movant need not present affidavits or new evidence of its own to meet its initial burden, but may premise its summary judgment motion on an attack on the opponent's evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Once the party seeking summary judgment has provided the requisite initial support for its motion, the burden shifts to the non-moving party to call evidence to the attention of the court sufficient to demonstrate a "genuine issue of material fact" as to each element which that party will have to prove at trial. *Id.* In resisting a motion for summary judgment, the non-movant may not rest on allegations in his pleadings, but must supply probative evidence such as affidavits, for example. *Anderson*

---

**3.** The court construes this claim as referring to § 13A–14–2 of the 1975 Alabama Code, which prohibits municipal councils and other government bodies from meeting in "secret session."

**4.** Thompson contends that "[t]he taping of a public meeting on a personal tape recorder for later use or distribution as a personal recounting of the events of the public meeting ... is an exercise of free speech," and charges defendants with adopting "a policy of prior restraint." The court notes that Thompson has not alleged that he was retaliated against for—as opposed to simply denied—the exercise of his first amendment rights, *see Mount Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (plaintiff with no independent right to government privilege may nevertheless establish federal claim if privilege was denied him "by reason of his exercise of constitutionally protected First Amendment freedoms"), nor has he claimed that he possessed a federal constitutional right to attend the May council meeting, which defendants violated.

Accordingly, the court need not confront such issues.

**5.** Although defendants contend that Thompson's prayer for prospective relief is now moot because he was permitted to tape record the one council meeting he has attended since May 1990, they have made clear their intention to prohibit Thompson from employing the recorder in the future if he "again begins misuse of the recordings to cause other trouble." *See* Defendants' Brief in Support of Motion for Summary Judgment, at 11. In light of this declaration and defendants' past actions, the court at this time cannot discount the credible threat that Thompson's tape recorder will again be banned in the future. Accordingly, Thompson has standing to seek injunctive relief. *See Virginia v. American Booksellers Ass'n, Inc.* 484 U.S. 383, 392, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988); *City of Houston, Texas v. Hill*, 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987).

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See generally* Issacharoff & Loewenstein, *Second Thoughts About Summary Judgment,* 100 Yale L.J. 73, 82–87 (1990). "Th[e] standard [for granting summary judgment] mirrors the standard for a directed verdict," and summary judgment is appropriate unless the facts before the court are such that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 250, 252, 106 S.Ct. at 2511, 2512.[6] However, in deciding a motion for summary judgment, a district court must consider, as this court has done, "all the evidence in the light most favorable to the non-moving party ... and resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion Int'l. Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. *Federal Issues*

In this section of its order, the court analyzes Thompson's federal claims, defendants' qualified immunity defense, and the issue of Clio's municipal liability. The court construes Thompson's complaint as presenting three federal claims: a first amendment claim directed at all defendants;[7] a fourth amendment property claim which names Cox, Ramsey, and the city;[8] and a fourth amendment force claim against all defendants except Ramsey.[9]

#### i. First Amendment Claim

■ In responding to Thompson's first amendment claim, defendants argue that the proscription on his use of a tape machine has little effect on his or the local public's ability to obtain or communicate information about council meetings.[10] Nevertheless, the ban on Thompson's tape recorder has some impact, however small or incidental, on how he is able to obtain access to and present such information, and as such regulates conduct protected by the first amendment. *See Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989); *Spence v. Washington,* 418 U.S. 405, 409–410, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (per curiam).

Although such incidental or "time, place, or manner" restrictions on expressive conduct are permissible where supported by a sufficiently important governmental interest, this deferential standard applies only where the regulation is "justified without reference to the content of the regulated speech."[11] *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). *See also United States v. Yonkers Bd. of Educ.,* 747 F.2d

---

6. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," and, furthermore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson,* 477 U.S. at 249–50, 252, 106 S.Ct. at 2511, 2512 (internal citations omitted).

7. Thompson appears to challenge both the policy against his use of a recorder and the enforcement of this policy through the seizure of his tape player at the April meeting and his removal from the council room at the May session.

8. Hinson and Johnson removed Thompson from the May meeting but were not involved in the confiscation of his recorder at the April meeting. Accordingly, they are also not defendants to Thompson's state law conversion claim.

9. Thompson contends that Johnson and Hinson hurt his arm while acting on Cox's orders to confiscate his tape recorder or remove him from the room. The court also interprets Thompson's state law assault and battery and false arrest claims as directed at these defendants.

10. It is undisputed that meetings of the Clio city council are open to attendance by local residents, that minutes of these sessions are maintained and made available to the public, and that neither the mayor nor anyone else has ever sought to prevent Thompson from discussing council proceedings with fellow citizens.

11. Defendants do not claim expanded authority to regulate Thompson's first amendment activities simply because the Clio city council meets in a public forum. Individuals enjoy the full range of first amendment protections while on public property that the state has opened for expressive activity. *Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

111, 114 (2nd Cir.1984) (analyzing rule barring newspaper reporter from tape recording civil trial as time, place, and manner restriction). The requirement of content-neutrality is particularly important where, as in this case, government operates "at the core of the First Amendment" by regulating speech that is "political" or that touches on "public issues." *See Boos v. Barry*, 485 U.S. 312, 317, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988).[12]

Here, Mayor Cox did not adopt an across-the-board ban on tape recorders in council meetings; instead, he directed the ban solely at Thompson and his particular use of his recorder.[13] The defendants argue that the ban is nevertheless constitutional because Thompson employed recordings of council sessions to misinform and foment anger among local citizens. However, in *Boos*, the Supreme Court recently rejected as "content-based" a similar justification for a District of Columbia ordinance forbidding, near foreign embassies, displays tending to bring the foreign country's government into "public odium" or "disrepute." The Court acknowledged that in *Renton* it had found a zoning ordinance limiting operation of adult movie theaters to be content-neutral because the regulation was justified by the "secondary effects" of the presence of such theaters on surrounding neighborhoods.[14] Yet it went on to find that the display restriction at issue in *Boos* was content-based because the city's defense of it—that it served "our international law obligation to shield diplomats from speech that offends their dignity"—focused on "[l]isteners' reactions to" and the "adverse emotional impact" of such speech, which "are not the type of 'secondary effects' we referred to in *Renton.*" *Boos*, 485 U.S. at 320–21, 108 S.Ct. at 1163–64. In this case, the defendants' justification for the prohibition on Thompson's tape machine—that he used his recordings of council meetings to "mislead" and "disturb" local residents—is similarly directed to the primary effects of his communications on listeners. Therefore, under the Court's holding in *Boos*, the tape recorder ban is not content-neutral. *Compare United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 114 (2nd Cir.1984) (rule prohibiting newspaper reporters' use of tape recorders in courtroom during civil trials justified by need to prevent witnesses from being inhibited by knowledge their words are being recorded, preserve dignity and decorum of courtroom, and protect official court reporter system).

Moreover, even in cases where the Supreme Court has allowed content-based regulations of speech, it has been careful to insist that they do not involve "viewpoint discrimination"—in other words, that the regulation is "not ... affected by sympathy or hostility for the point of view being expressed by the communicator." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 67, 96 S.Ct. 2440, 2451, 49 L.Ed.2d 310 (1976). As one commentator has noted,

**12.** Indeed, there is perhaps no area of expression more deserving of constitutional protection and more fundamental to the democratic system of government whose vitality the first amendment was designed to safeguard, than communication by a political representative to his constituents. *See Brown v. Hartlage*, 456 U.S. 45, 52–53, 102 S.Ct. 1523, 1528–29, 71 L.Ed.2d 732 (1982). Of course, the court recognizes that, at the same time, because this case raises difficult, sensitive issues concerning its authority and competence to intervene in a dispute—or perhaps to put it more accurately, a "feud"—*within* the political branch of a city government, it is one that would ideally best be resolved through peaceful settlement.

**13.** Mayor Cox acknowledges in his deposition that he had not previously objected to Thompson's recording council meetings for his "personal use," but rather, that he banned Thompson from bringing the tape machine to these meetings specifically because he played these tapes for others. *See* defendants' Amendment to Submission in Support of Summary Judgment, filed February 25, 1991, Exhibit 1, at 23, 28. Moreover, Cox's testimony reveals that he objected specifically to Thompson's use of such recordings rather than generally to the release of tapes of council sessions. For example, Cox stated he had not and would not apply the tape recorder ban to television stations that wished to videotape and broadcast portions of council meetings. *See id.* at 50.

**14.** The ordinance in *Renton* was designed to "prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life." 475 U.S. at 48, 106 S.Ct. at 929 (quotations omitted).

"Viewpoint discrimination is censorship in its purest form and has traditionally been subjected to the highest level of scrutiny." Tribe, *American Constitutional Law*, at § 12–3, at 800 (2d ed.1988). The present record demonstrates that the ban was motivated more by Thompson's opposition to Mayor Cox and the fact that he appears to have replayed tapes of selected council meetings for the purpose of supporting his criticisms of the mayor and the council, than by any generalized fear of communications regarding council proceedings. The circumstances under which the tape machine ban was adopted and the fact that it is directed solely at Thompson indicate that it is not even viewpoint-neutral.

 Because the recorder ban is content-based as well as viewpoint based, the state's burden of justifying the policy is far more severe than in the case of a legitimate time, place, or manner regulation. "[C]ontent-based restriction[s] on political speech ... must be subjected to the most exacting scrutiny," and are constitutionally permissible only where "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988). The defendants in this case have not argued that their desire to avoid the misinformation or angry responses that they believed Thompson's tape recordings engendered qualifies as a "compelling state interest." Indeed, such a purpose is not even a legitimate one, for the Supreme Court has frequently recognized that the disruptive or disturbing effects of expression are integrally bound up with the very political value of free speech that the first amendment was designed to safeguard and nurture.[15] Furthermore, although the state may legitimately forbid speech intended and likely to incite "imminent lawless action," *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam), Thompson's recording of council meetings and replaying of these tapes cannot be made to fit within this narrow category based simply on evidence of a single hostile citizen. *See Texas v. Johnson*, 491 U.S. 397, 408–09, 109 S.Ct. 2533, 2541–42, 105 L.Ed.2d 342 (1989); *Monroe v. State Court of Fulton County*, 739 F.2d 568, 575 (11th Cir.1984).[16]

For these reasons and based on the evidence now before it, the court concludes that defendants have failed to demonstrate that they are entitled to a judgment as a matter of law on Thompson's first amendment claim.

ii. Fourth Amendment Property Claim

 Thompson next contends that his fourth amendment right of freedom from unreasonable seizures was violated when Ramsey, acting on Cox's order, removed his tape recorder during the April council

---

**15.** *See Texas v. Johnson*, 491 U.S. 397, 408–09, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989) ("a principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.") (*quoting Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 894, 896, 93 L.Ed. 1131 (1949)). *See also Boos*, 485 U.S. at 322, 108 S.Ct. at 1164; *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).

Nor, of course, do defendants' allegations that the tapes Thompson replayed were somehow inaccurate or incomplete lend any support to their position. It is well settled that the protections of the first amendment do not turn on the truth of an idea or belief. *New York Times v. Sullivan*, 376 U.S. 254, 271–72, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) ("erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive'") (citation omitted). *Accord Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987).

**16.** Not only are defendants able to point to only one local citizen who was angered by Thompson's recordings, but in addition, they have failed to demonstrate that the ensuing "disturbance" resulted from the information conveyed by Thompson rather than, for example, from the temperaments of the citizen and the city clerk who were involved in this confrontation; that the incident involved the kind of actual violence or lawbreaking necessary to justify restricting speech under the *Brandenburg* test; or that they lack other means of preventing public disturbances or violence far more effective and less restrictive of speech than the ban on Thompson's cassette player. *See Johnson*, 491 U.S. at 408–09, 109 S.Ct. at 2541–42; *Monroe*, 739 F.2d at 575.

session and placed it outside the room, where Thompson retrieved it after the meeting. Recent Supreme Court cases teach that, where a fourth amendment intrusion serves governmental needs beyond the traditional interest in law enforcement—in other words, purposes unrelated to criminal investigation—the constitutionality of a search or seizure should be judged according to a "reasonableness" standard. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989); *O'Connor v. Ortega*, 480 U.S. 709, 722–23, 107 S.Ct. 1492, 1500, 94 L.Ed.2d 714 (1987). Thus in reviewing Thompson's challenge to the temporary confiscation of his tape machine, the court must balance the nature and extent of the intrusion occasioned by the removal of his recorder against the legitimate government interests served by such an action. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *Ortega*, 480 U.S. at 722–23, 107 S.Ct. at 1500.

Ramsey, the Clio police chief, acknowledges that he seized Thompson's tape player for the same reason that Cox settled on the no-recorder policy: because Thompson had been replaying "misleading" record-

ings of council proceedings.[17] Since the court has already determined, in its analysis of Thompson's first amendment claim, that such a "government interest" is not only illegitimate, but in fact is offensive to the first amendment, the court now finds that, on the present record, Ramsey's physical removal of the machine was also "unreasonable" under the fourth amendment. In considering the defendants' motion, this court notes that it has not discounted the possibility that certain fourth amendment injuries may be so trivial—particularly in cases involving seizures of property rather than physical harm to an individual—as to fall short of a federal constitutional deprivation, regardless of how unwarranted may have been the state action that inflicted the injury.[18] Here, however, the complete lack of justification for the seizure, coupled with the fact that it denied Thompson an important use of his property, leads the court to conclude that Ramsey's removal of Thompson's tape recorder rose to the level of a violation of Thompson's fourth amendment rights. Accordingly, defendants are also not entitled to a judgment as a matter of law on this claim.

iii. Fourth Amendment Force Claim

■ Thompson's third and final federal claim also arises under the fourth amend-

---

**17.** In his deposition testimony, Ramsey indicated that he had been told of Thompson's communication of false information about council proceedings through his recordings, and stated that the presence of Thompson's tape machine at the April session was, as a result, "disrupting" the meeting by causing other council members to be hesitant to speak. Ramsey, of course, does not contend that this "disruption"—which he described as a state of "total silence"—fell within the ambit of the state's disorderly conduct statute. *See* 1975 Code of Alabama § 13A-11-7. Nor does he argue that he removed Thompson's tape machine on the order and by the authority of the mayor. *See* defendants' Amendment to Submission in Support of Summary Judgment, filed February 25, 1991, Exhibit 5, at 9–14.

**18.** There is some division among the circuit courts of appeal on this issue. *Compare Johnson v. Morel*, 876 F.2d 477, 479–80 (5th Cir.1989) (per curiam) (en banc) (police officer's excessive use of force does not constitute constitutional deprivation absent "significant injury"), *with Titran v. Ackman*, 893 F.2d 145, 147 & n. ** (7th Cir.1990) ("a state is not free to inflict

... pains without cause just so long as it is careful to leave no marks") (citation omitted). In the one recent Eleventh Circuit case, the court agreed that a valid excessive force claim under § 1983 requires "some evidence of injury beyond a minimal one." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991). However, unlike the case now before the court, *Bennett* involved an eighth amendment challenge by a prisoner and, furthermore, did not define with particularity the nature of a "minimal" injury. Moreover, in another recent case involving the excessive use of force, the Eleventh Circuit reinstated a jury verdict in favor of a plaintiff with apparently no inquiry into whether the individual, who had been "kicked in the back" and "dragged ... on the ground," had sustained any injuries. *See Ortega v. Schramm*, 922 F.2d 684, 694–96 (11th Cir. 1991). The Supreme Court recently granted certiorari in a Fifth Circuit case that raises this issue in the context of a prisoner's eighth amendment claim. *See Hudson v. McMillian*, 911 F.2d 727 (5th Cir.1990) (Table) (opinion available on WESTLAW), *rev'd*, 929 F.2d 1014 (5th Cir. 1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 645 (1991).

ment. He contends that when the two police officers, Johnson and Hinson, grabbed his arm at the May meeting, such a use of force was excessive and unjustified, and thus constituted an unconstitutional "seizure" of his person. In support of this claim, Thompson has submitted his own affidavit in which he states that as a result of the officer's actions, he "had to seek medical treatment for injury to my arm." [19] Also before the court is an excerpt from Thompson's deposition testimony, in which he indicates that a doctor who examined him the night of this incident gave him a sling and a brace for his arm which Thompson removed the following day, and that since that time, his arm "hurts once in a while." [20]

Like a seizure of property for purposes other than law enforcement, as discussed above, the constitutionality of any application of force against a citizen by a state official, in connection with a criminal investigation or otherwise, is judged under a fourth amendment "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop,

or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). This test "is not capable of precise definition or mechanical application," but rather requires an evaluation of all "the facts and circumstances confronting" the officer. *Id.* at 396–97, 109 S.Ct. at 1871–72. The court must balance " 'the nature and quality of the intrusion on the individual's fourth amendment interests' against the importance of the governmental interests alleged to justify the intrusion." *Ortega v. Schramm*, 922 F.2d 684, 694 (11th Cir. 1991), *quoting Graham*, 490 U.S. at 396, 109 S.Ct. at 1871.

Again, however, because the court has already found that the defendants' attempts to prevent Thompson from recording council proceedings served only an improper, unconstitutional government purpose, it also finds that, accepting Thompson's evidence of injury to his arm, the physical force employed by Johnson and Hinson in effectuating this no-recorder policy was unreasonable.[21] Furthermore, the court finds that under Thompson's account his injuries were more than trivial or nominal.[22] Accordingly, summary judgment in favor of defendants on this claim is also not merited.[23]

**19.** *See* plaintiff's Response to Defendants' Motion for Summary Judgment, filed February 11, 1991 (affidavit attached).

**20.** *See* defendants' Amendment to Submission in Support of Summary Judgment, filed February 25, 1991 (Exhibit 2, at 69, 86–87).

**21.** Like Police Chief Ramsey, who removed Thompson's recorder at the April meeting, Hinson and Johnson justify their treatment of Thompson at the May session by reference to the "disturbance" that Thompson's recordings were purportedly causing in the community and, as a result, among the council members. *See* defendants' Amendment to Submission in Support of Summary Judgment, filed on February 25, 1991, Exhibit 3, at 10–12; *id.*, Exhibit 4, at 8. *In* addition, however, Johnson, unlike Ramsey and Hinson, *see id.*, Exhibit 5, at 16; Exhibit 4, at 20, also defends his actions against Thompson by reference to the mayor's order to remove the recorder. *See id.*, Exhibit 3, at 10. The court finds that such a justification is entitled to little weight in evaluating the reasonableness of Johnson's conduct for the purposes of evaluating either the merits of Thompson's fourth amendment claims or Johnson's quali-

fied immunity defense to these allegations. *See* section II(B)(iv) of the court's order. While law enforcement officers, like other government employees, may be said to act reasonably in simply "following orders" by their employers or supervisors as to certain job tasks, it is well settled that the authority of police to seize a citizen's property or use force against his person is circumscribed by state and federal law, and may not be expanded simply by fiat. *See* 1975 Code of Alabama § 13A–3–27 (specifically defining situations in which peace officer may legally use physical force, and explicitly *not* authorizing use of force by officer against "innocent person whom he is not seeking to arrest or retain in custody").

**22.** *See supra* note 18.

**23.** Although Cox did not specifically instruct the officers to use force, the evidence presently before the court suggests that Cox was aware Thompson would not voluntarily relinquish the machine and, therefore, that he anticipated that *the officers would be required to use force in* carrying out his order. Based on this and on the fact that defendants have not argued Cox's

#### iv. Qualified Immunity

##### a. *First Amendment Claim*

■ The individual defendants in this case have also pled the affirmative defense of qualified immunity as to Thompson's claims against them in their individual capacities.[24] " '[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate the clearly established statutory or constitutional rights of which a reasonable person should have known.' " *Nicholson v. Georgia Dep't of Human Resources*, 918 F.2d 145, 146 (11th Cir.1990), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Such a formulation of the defense of qualified immunity seeks to accommodate the conflicting values of, on the one hand, allowing victimized individuals a "realistic avenue for vindication of constitutional guarantees," and, on the other, limiting the inevitably disruptive effect of litigation on the ability of public officials to discharge their duties. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Nonetheless, as applied by the courts, the defense serves as a "powerful constraint" on the ability of plaintiffs to recover damages under § 1983. *See Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).[25] The defense of qualified immunity presents a legal issue which is properly raised and decided by the district court prior to trial, for example, through a motion for summary judgment. *Ansley v. Heinrich*, 925 F.2d 1339, 1347 (11th Cir.1991).

The Eleventh Circuit has adopted a two-step analysis for determining whether, given the facts of a particular case, a defendant is entitled to qualified immunity as a matter of law. First, the defendant public official must demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.1988). Once the official makes this showing, the burden shifts to the plaintiff to prove first that "the legal norms allegedly violated by the defendants were clearly established at the time the defendants acted," and second, to "adduce[ ] evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights guaranteed by the clearly established law." *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir.1990). *See also Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir.1990).

The individual defendants in this case—Cox, the mayor, Ramsey, the police chief, and police officers Johnson and Hinson—were performing duties within the scope of their respective discretionary authorities when they sought to prevent Thompson from tape recording the April and May council meetings. *See Hutton*, 919 F.2d at 1537. As the court notes in its discussion of Thompson's claims against the city, Cox's own powers as chairperson of the council, as well as those effectively delegated to him by this body, embraced, at the very least, procedures governing the use of tape recorders during meetings.[26] Similarly, the court assumes, for the purposes of deciding defendants' motion, that maintaining order at council meetings and

---

lack of responsibility for the use of force in their summary judgment pleadings, the court specifically finds that Cox is not entitled to judgment on this claim as a matter of law.

**24.** Qualified immunity is not available either to Cox, Ramsey, Johnson, and Hinson as to claims against them in their official capacities, *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985), or to the city of Clio. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). In addition, although defendants do not specify which of Thompson's claims they argue

should be dismissed on qualified immunity grounds, the court has evaluated this defense only with regard to Thompson's first and fourth amendment claims, as qualified immunity is not a defense to state law causes of action. *Andreu v. Sapp*, 919 F.2d 637, 640 (11th Cir.1990).

**25.** *See also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").

**26.** *See* section II(B)(v) of the court's order.

specifically enforcing the rules of the council were part of the "normal job duties" of the police defendants in this case and were within the authority delegated to them by the mayor and council, their employers. *See Rich,* 841 F.2d at 1564.

The court, therefore, must inquire next into whether the defendants' treatment of Thompson "violated clearly established constitutional law." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1322 (11th Cir.1989). As to each defendant, such a determination turns on whether "an objective, reasonable government official" could have believed his actions were lawful in light of existing statutory and case law and the information the defendant possessed at the time the conduct occurred. *Nicholson,* 918 F.2d at 147. *See also Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038. In determining whether it was "clearly established," the relevant legal rule must be identified at a fairly "particularized" and "fact-specific" level of generality. *Nicholson,* 918 F.2d at 147. A plaintiff may not discharge his burden simply by making "general, conclusory allegations of some constitutional violation or by stating broad legal truisms," but must point to how "abstractions" such as "probable cause" and "reasonableness" have been "applied in concrete circumstances." *Barts,* 865 F.2d at 1190, 1194. However, the standard is "not one of factual rigidity," *Nicholson,* 918 F.2d at 147, and the plaintiff is not required to show that "the very action in question has previously been held unlawful." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. "Although officials need not predict the future course of constitutional law, ... they are required to relate established law to analogous factual settings." *Stewart,* 908 F.2d at 1504. There are good reasons for not requiring *precise* factual correspondence between the case at issue and reported case law: to do so would be, in effect, to grant public officials free rein to violate individuals' rights with impunity on at least one and possibly multiple occasions. *See Garcia v. Miera,* 817 F.2d 650, 656, 657 & n. 8 (10th Cir. 1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *People of Three Mile Island v. Nuclear Regulatory*

*Comm'rs,* 747 F.2d 139, 144–45 (3rd Cir. 1984).

As the court recognized in its discussion of the merits of Thompson's first amendment claim, it is well established that while protected speech is subject to legitimate "time, place and manner" regulations by government, such restrictions must, among other requirements, be content-neutral. *See, e.g., Boos v. Barry,* 485 U.S. 312, 319, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980). The court has already found that on the present record the tape recorder ban was neither content-neutral nor necessary to serve a "compelling state interest," the standard for judging content-based restrictions on constitutionally protected expression. *Boos,* 485 U.S. at 321, 108 S.Ct. at 1164. Nonetheless, the court may not reject defendants' qualified immunity defense to Thompson's first amendment claim simply on the basis that legal standards such as "content-neutrality" or the "compelling state interest" test were clearly established in April and May of 1990. *See Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987) (fact that standard of review to evaluate prison officials' action in the context of the first amendment may have been clearly established held insufficient to negate qualified immunity defense where that standard had not previously been applied so as to recognize right of inmate to change name for religious purposes). To carry his burden, Thompson must also persuade the court that a reasonable government official, possessed of the same factual information as each defendant, would have been on notice that as a matter of law the tape recorder ban regu-

lated speech protected by the first amendment but did not fit within either of these two standards, or satisfy any other available legal justification.

First, the court finds that although, in April and May of 1990, there existed no Eleventh Circuit or United States Supreme Court case recognizing the first amendment implications of the use of tape recorders, *but see United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 114 (2nd Cir. 1984) (analyzing rule barring newspaper reporter from tape recording civil trial as time, place, and manner restriction), the applicable standard for determining when conduct falls within the scope of the first amendment, together with the broad range of particular activities whose communicative nature these courts have recognized, would clearly have alerted a reasonable government official that the prohibition on Thompson's tape machine trenched in the area of his first amendment rights. Conduct falls within the ambit of the first amendment where "an intent to convey a particularized message [is] present, and ... the likelihood [is] great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). On the basis of this broad standard, the Court has recognized the expressive nature of not only flag burning, *id.*, but also the wearing of black armbands, *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969), civil rights sit-ins, *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966), and even "overnight sleeping" in connection with a demonstration, *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984), just to name a few examples. The law was clear that

Thompson's recording and replaying of tapes of council meetings constituted first amendment activity.

Second, the court also finds that a reasonable government official, in the position of any of the defendants, would have been aware that the admitted rationale for banning Thompson's tape recorder—that he was "disturbing" local residents through "misleading" recordings of council meetings—was neither "content-neutral," a "compelling state interest," nor a sufficient justification for regulating protected speech under any other standard, according to clearly established first amendment law.[27] Again, although the unusual events that transpired in the city of Clio during April and May of 1990 do not correspond to the facts of any reported case, as the court recognized in its discussion of the merits of Thompson's first amendment claim, it was the law of the land at the time this cause arose that government interference with speech which turns on or is motivated by "[l]isteners' reactions to" and the "adverse emotional impact" of such expression is categorically not content-neutral, and therefore may not be justified as an incidental or "time, place, or manner" restriction. *Boos v. Barry*, 485 U.S. 312, 321–22, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988). Furthermore, as the court also has already explained in detail, no reasonable official could possibly have thought that the ban on Thompson's recorder was free of first amendment problems on the basis that it was necessary to advance any legitimate, let alone compelling, governmental purpose; the state's interests do not extend to ensuring against angry citizens, and there was no basis in this case to believe that Thompson's use of an audio recorder was intended or likely to incite "imminent lawless action." [28] In short, the court finds

---

27. All the individual defendants understood that Thompson's dissemination of recordings of council meetings and the resulting "disturbance" were the reason for the ban on his use of the recorder. *See* defendants' Amendment to Submission in Support of Summary Judgment, filed February 25, 1991, Exhibit 1, at 21–23, 45, Exhibit 3, at 11–12, Exhibit 4, at 8, 11, Exhibit 5, at 9.

28. *See* section II(B)(i) of the court's order. Several of the police defendants in this case justified their actions by likening Thompson's use of a tape recorder at the April and May council meetings to disorderly conduct. *See* defendants' Amendment to Submission in Support of Summary Judgment, filed February 25, 1991, Exhibit 3, at 10, Exhibit 4, at 12 and 20–21, Exhibit 5, at 10–12. However, the deposition

that Thompson has certainly raised a genuine issue of fact as to whether defendants violated his clearly established rights under the first amendment.

### b. *Fourth Amendment Claims*

■ Whether government officials violate the fourth amendment in seizing an individual's property or person depends on the reasonableness of the seizure. *See O'Connor v. Ortega,* 480 U.S. 709, 722–23, 107 S.Ct. 1492, 1500, 94 L.Ed.2d 714 (1987); *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).[29] Because this standard involves a case-by-case balancing of the nature and extent of the intrusion against the legitimate governmental needs served by the seizure, rather than any categorical rule, officials will usually be able legitimately to claim qualified immunity for such conduct. In *Dartland v. Metropolitan Dade County,* 866 F.2d 1321 (11th Cir.1989), the Eleventh Circuit reached a similar conclusion with regard to qualified immunity for adverse government action against employees on the basis of their first amendment speech. Recognizing that such claims were subject to a test that balanced on a case-by-case basis the employee's and the government employer's interests, the court observed that "there will rarely be a basis for an *a priori* judgment that the termination or discipline of a public employee violated 'clearly established constitutional rights.'" *Id.* at 1323 (citation omitted). The court concluded that "[b]ecause no bright-line standard puts the reasonable public employer on notice of a constitutional viola-

tion, the employer is entitled to immunity except in the extraordinary case where ... balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Id. See also Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) (in determining whether qualified immunity exists for allegedly unlawful arrest, "the issue is not probable cause in fact but 'arguable' probable cause") (citation omitted).

In this case, however, as the court has already indicated, the government's "interest" in confiscating Thompson's tape recorder at the April meeting and using force against Thompson himself at the one in May—to prevent his purportedly "misleading" communication of council proceedings—was not only illegitimate but was itself offensive to the first amendment. For this reason, a reasonable public official would have clearly understood that both seizures were unreasonable under the fourth amendment, regardless of the nature or extent of each intrusion. In other words, because defendants' actions served only an improper, unconstitutional purpose, such conduct was illegal according to a "bright-line standard" or "*a priori* judgment."

This conclusion is consistent with the Eleventh Circuit's holding in *Stewart v. Baldwin County Board of Education,* 908 F.2d 1499 (11th Cir.1990), a recent case that, like *Dartland,* raised the issue of qualified immunity in the context of the same balancing test for government employee first amendment claims. In language reminiscent of *Dartland,* the court

---

testimony of these officers demonstrates not only that Thompson was not disturbing the meeting in violation of state law, *see* 1975 Code of Alabama § 13A–11–7, but also that the officers had a distinctly *un*reasonable understanding of the scope of their authority under this statute. For example, Ramsey stated that the presence of Thompson's tape machine was "disturbing the peace" by producing a situation of "total silence" at the May meeting, *see id.,* Exhibit 5, at 12, and Johnson was able to envision a situation in which even the use of a "pen" could cause a "disturbance," permitting him to confiscate such a writing implement. *See id.,* Exhibit 4, at 21. *Compare Hutton v. Strickland,* 919 F.2d 1531, 1539 (11th Cir.1990) (police officers entitled to qualified immunity where facts

within their knowledge gave rise to probable cause to believe plaintiffs were violating Florida trespass law). Finally, the court notes that in defending the removal of Thompson's recorder, several of the police defendants also referred to Thompson's angry manner and harsh language —specifically, his use of the word "damn"—at one or both of the meetings. However, the evidence before the court demonstrates that whatever confrontation occurred between Thompson and defendants at each meeting arose only after the latter sought to remove Thompson's tape player.

**29.** *See also* section II(B)(ii) and (iii) of the court's order.

in *Stewart* recognized that the applicable balancing test "is necessarily conducted on a case-by-case basis, and thus will often result in a balancing of interests that is insufficiently one-sided so as to clearly establish the plaintiff's constitutional right." *Id.* at 1506. However, the court concluded that the defendants were not entitled to qualified immunity because they could "point to no interests which the squelching of [the plaintiff employee's] speech served in this case." *Id.* Here, as in *Stewart,* the outcome of the balancing test is little in doubt where no weight whatsoever attaches to one side of the scale. Because Thompson has presented evidence that Cox and his police officers infringed upon his clearly established rights under the fourth amendment, defendants are not entitled to qualified immunity as to these claims.

### v. Municipal Liability

■ Even if Thompson is able to prove that the individual defendants in this case violated his first and fourth amendment rights, he may not sustain a claim against the city of Clio under § 1983 simply on the basis that these individuals were employed by or acting on behalf of the city.[30] *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1479 (11th Cir.1991). To demonstrate "municipal liability," Thompson must also establish that the city itself, through a government "policy," caused the constitutional violation. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 736–37, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir.1989). It is the responsibility of the trial judge to identify those officials or government bodies who, as a matter of state law, have final policymaking authority concerning the action alleged to have caused a constitutional violation. *Jett,* 491 U.S. at 736–37, 109 S.Ct. at 2723; *Brown,* 923 F.2d at 1481 n. 11. Once the court has made such a determination, "it is for the jury to determine whether [the policymakers'] decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723.

■ In this case, the court initially is guided by § 11–43–52 of the Alabama Code of 1975, which provides that a city council itself is empowered to "determine the rules of its own proceedings." There is no evidence that the Clio city council, the municipal policymaker in this case, affirmatively decided to ban Thompson's tape recorder or to seize him or the machine when he refused to comply. However, this is not the end of the inquiry. The decision of a "subordinate" official, such as Mayor Cox in this case, may constitute final municipal policy under several scenarios, two of which are relevant here. First, government policymakers may delegate, in a broad sense, the authority they possess under state law over certain areas or issues to a lower official. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126–27, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988); *Mandel,* 888 F.2d at 792. *See also Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 n. 12, 106 S.Ct. 1292, 1300 n. 12, 89 L.Ed.2d 452 (1986). Second, where policymakers "approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Mandel,* 888 F.2d at 792 n. 16, *quoting Praprotnik,* 485 U.S. at 172, 108 S.Ct. at 926.[31]

Having considered the present record in this case, the court finds that, under both the delegation and ratification theories of municipal liability, Cox was the final policymaker with respect to regulations on the use of tape recorders during Clio city council meetings. First, Cox's statements in his deposition and at the April meeting indicate that the council had transferred generally to him, as mayor and chair of the council,

---

**30.** The city raises the issue of municipal liability on summary judgment, albeit obliquely. *See* defendants' Brief in Support of Motion for Summary Judgment, filed January 28, 1991, at 2–4.

**31.** Where a plaintiff succeeds in proving a city policy based on the delegation of authority or the ratification of a particular decision by a final policymaker, he need not also prove that the challenged conduct was part of a sufficiently widespread or longstanding custom or practice. *See Brown,* 923 F.2d at 1481.

the power to determine the rules and procedures that governed council sessions.[32] *See Mandel,* 888 F.2d at 794. Second, the evidence before the court also suggests that the council effectively ratified Cox's specific policy against Thompson's use of a tape recorder at council meetings. Cox enforced the ban at two separate council meetings by forcefully confronting Thompson, both verbally and through orders to the defendant police officers to remove physically the recorder. Several if not all members of the council other than Cox and Thompson were present during these altercations, and apparently none objected to the proscription on Thompson's tape machine.[33] For these reasons, the court concludes that the city of Clio is not entitled to summary judgment, and that Thompson may proceed to trial on his municipal liability claims.[34] However, the city is free to present evidence at trial that Cox was not the final policymaker for purposes of the council's regulation of tape recorders, and the court will, if appropriate, reconsider today's ruling in light of such evidence.[35]

## C. *State Law Issues*

In this section of its order, the court analyzes Thompson's conversion, assault and battery, and false arrest claims, as well as his allegations under the Alabama "open meetings" law.

### i. Conversion

In response to Thompson's state law claim that the seizure of his recorder at the April meeting constituted an illegal conversion, Cox and Ramsey argue they removed the machine from Thompson's possession only for a short time and that they did not do so for their own use or benefit. However, these factors are not elements of an action for conversion under Alabama law. Rather, to sustain a claim for conversion, Thompson need demonstrate (1) "a wrongful detention or interference ... or an illegal use or misuse" by Cox and Ramsey (2) of or with property of which Thompson either was in actual possession or had a right to immediate possession, (3) "in exclusion or defiance" of his possessory rights. *Covington v. Exxon Co., U.S.A.,* 551 So.2d 935, 938 (Ala.1989). *Accord Flanagan v. World Omni Financial Corp.,* 539 So.2d 248, 250 (Ala.1989). It is true, as these defendants note, that the interference with the plaintiff's possessory rights must be "substantial" in order to give rise to a cause of action for conversion. *Martin v. Luckie & Forney, Inc.,* 549 So.2d 18, 19 (Ala.1989). However, as *Martin* itself makes clear, such language is simply a rephrasing of the requirement that the defendant's actions have resulted in "exclusion or defiance" of the plaintiff's

**32.** *See* defendants' Amendment to Submission of Evidence in Support of Summary Judgment, filed February 25, 1991, Exhibit 1, at 14, 31. *See also* plaintiff's Motion to Strike, filed January 22, 1991, Exhibit (partial transcript of April, 1990 council meeting).

**33.** *See* plaintiff's Motion to Strike, filed January 22, 1991, Exhibits (partial transcript of April, 1990 council meeting); defendants' Amendment to Submission of Evidence in Support of Summary Judgment, filed February 25, 1991, Exhibit 2, at 55.

**34.** Specifically, the court finds that Thompson has provided sufficient evidence on municipal liability as to all three of his federal claims against the city. Evidence as to the council's ratification of the no-recorder policy is sufficient at this stage of the litigation to allow Thompson to proceed with his first amendment claim against the city, as this claim is based on the policy itself. Moreover, because the seizure of Thompson's recorder at the April meeting and the use of force to remove him from the

May meeting simply constituted enforcement of the no-recorder policy, the present record also offers evidence of the city's liability with regard to Thompson's fourth amendment claims. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) ("when the '*execution of* the government's policy or custom ... inflicts the injury' ... the municipality may be held liable under § 1983) (citation omitted) (emphasis added); *Pembaur,* 475 U.S. at 477, 106 S.Ct. at 1297 (municipalities may be held liable where "action *pursuant to* official municipal policy of some nature caused a constitutional tort") (citation omitted) (emphasis added).

**35.** Although the identification of a policymaker is a question for the trial judge, this court has not discovered any case that commands it be answered as a final matter at the summary judgment stage. Indeed, because this inquiry is often a "fact-sensitive one," *Mandel,* 888 F.2d at 793, it is entirely appropriate for the court to resolve it ultimately upon consideration of the evidence presented at trial.

rights. *Id.* Thus in this case, Ramsey would not be guilty of conversion had he simply picked up Thompson's tape machine and returned it to him a few moments later. The evidence shows that Ramsey placed the recorder outside the council room, effectively preventing Thompson from using it during the proceedings. Such an action constituted "substantial interference" with Thompson's possessory rights. Because the court has, in evaluating Thompson's federal claims, already determined that on the present record the seizure was "wrongful" and "unlawful"— the only other contested element of his conversion allegation—Thompson is entitled to proceed to trial on this claim.

### ii. Assault and Battery

■ Thompson has presented evidence, in the form of his own affidavit and deposition testimony, that Johnson and Hinson, acting under Cox's orders, physically removed him from the council room and thereby injured his arm, requiring him to seek medical treatment. Such evidence is sufficient to raise a genuine issue of fact as to defendants' civil liability for assault and battery under Alabama law. *See Allen v. Walker*, 569 So.2d 350, 351 (Ala. 1990); *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986). Furthermore, defendants have failed to demonstrate that they are entitled to the statutory defense available for peace officers who use reasonable force to effect a proper arrest or otherwise maintain custody over a suspected criminal offender. *See* 1975 Code of Alabama § 13A–3–27.

### iii. False Arrest

■ Thompson has also succeeded in raising a genuine issue of fact as to his claims against Cox, Hinson, and Johnson for false arrest, arising out of his removal from the council room at the May meeting. These defendants lacked a warrant, probable cause to believe a crime had been committed, or any other lawful justification for this seizure of Thompson's person, one of the elements of false arrest or false imprisonment, as it is also known under Alabama law. *See Whitlow v. Bruno's, Inc.*, 567 So.2d 1235 (Ala.1990); *Goodwin v. Barry Miller Chevrolet*, 543 So.2d 1171 (Ala. 1989). Moreover, although defendants' evidence suggests that Thompson left the meeting of his own volition after Hinson and Johnson sought to confiscate his cassette player, Thompson states in his affidavits that he was physically placed into custody and removed from the May meeting.[36] Such an allegation, if proven, would satisfy the second, "arrest" element of Thompson's cause of action. *See Peoples v. State*, 510 So.2d 574, 575 (Ala.1987). Accordingly, defendants are not entitled to summary judgment on this claim.

### iv. Alabama "Open Meetings" Law

■ Finally, Thompson contends that by preventing him from remaining at the May council meeting unless he relinquished his tape recorder, defendants violated Alabama's "open meetings" or "sunshine" law. 1975 Code of Alabama § 13A–14–2. It is true that this statute, which by its terms forbids "executive or secret session[s]" of any public body, including "municipal council[s]," requires that Clio city council meetings be "open to the public," of which Thompson is a member although he also sits on the council. *Dale v. Birmingham News Co.*, 452 So.2d 1321, 1323 (Ala. 1984). The law thus guarantees citizens the right to attend certain government proceedings, but does not limit the conditions which government bodies may place upon such attendance. The "open meetings" law did not grant Thompson the right to record the council session, only to be present. Therefore, defendants did not violate the law by insisting he put aside his tape recorder, regardless of whether the

---

**36.** *See* plaintiff's Motion to Strike, filed January 22, 1991 (affidavit attached); plaintiff's Response to Defendants' Motion for Summary Judgment, filed February 11, 1991 (affidavit attached).

**1082**

basis for this demand was reasonable or legitimate.[37] For this reason, defendants are entitled to judgment as a matter of law on this claim.

### III.

Accordingly, it is the ORDER, JUDG-MENT, and DECREE of the court:

(1) That the motion for summary judgment, filed by defendants Bobby R. Cox, David Hinson, Robert Ramsey, Richard Johnson, and the city of Clio on January 15, 1991, as amended on February 25, 1991, be and it is hereby granted as to plaintiff Gene Thompson's claim under the Alabama "open meetings" law, 1975 Code of Alabama § 13A–14–2, but denied as to all of plaintiff Thompson's other claims; and

(2) That plaintiff Thompson's claim under 1975 Code of Alabama § 13A–14–2 be and it is hereby dismissed.

**37.** It is undisputed that Thompson would have been permitted to remain had he abided by this demand.